# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

MOHAMMAD ELDEEB,

      Plaintiff,

vs.                                                        CASE NO.: 8:07-cv-236-T-17EAJ

MICHAEL CHERTOFF, et al.,

      Defendants.

_____/


## ORDER ON MOTION TO DISMISS

    This cause comes before this Court on a motion to dismiss and incorporated memorandum in support filed by Defendants, Michael Chertoff, et al., (Docket No. 10), a memorandum in opposition filed by Plaintiff, Mohammad Eldeeb ("Eldeeb") (Docket No. 11), and a reply brief in support of motion to dismiss filed by Defendants, (Docket No. 16).


## BACKGROUND

*The Parties*

    Plaintiff Eldeeb is a citizen of Egypt. Sometime prior to July 22, 2003, Eldeeb married a United States citizen. On July 22, 2003, Plaintiff filed a form I-485 Application to Adjust Status ("I-485") to that of a lawful permanent resident, based on his marriage to a United States citizen. Four years later his application is still pending. In order to expedite the adjudication of his application, Eldeeb filed a complaint for a writ in the nature of mandamus with this Court.

    The first named defendant is Michael Chertoff ("Chertoff"), Secretary of The Department of Homeland Security ("DHS"). Chertoff is generally charged with supervisory authority over all operations of the DHS. The DHS is charged generally with

enforcement of the Immigration and Nationality Act ("INA"), and specifically with adjudication of I-485 applications such as the one in this action. The second named defendant is Emilio Gonzalez ("Gonzalez"), Director, United States Citizenship and Immigration Services ("CIS"). Gonzalez is generally charged with supervisory authority over all operations of the CIS. CIS is an agency within the DHS to whom adjudication of I-485 applications has been delegated. The third named defendant is Andrea Quarantillo ("Quarantillo"), District Director, United States Citizenship and Immigration Services. Quarantillo is generally charged with supervisory authority over all operations of the CIS Newark District Office, where Eldeeb's I-485 application is pending. The fourth named party is Robert Mueller ("Mueller"), Director, Federal Bureau of Investigation ("FBI"). Mueller is generally charged with supervisory authority over all operations of the FBI, and, specifically, with performing Name Checks on all I-485 applicants. It is this Name Check that is delaying adjudication of Eldeeb's application. All defendants are sued in their official capacity only.

*I-485 Applications*

The CIS conducts numerous criminal and national security checks on I-485 applicants, and, pursuant to CIS policy, all applicants must pass all required security checks before their applications can be adjudicated. Once CIS receives an I-485 application, a file is opened and an electronic record for the applicant is created. The application then awaits further processing based on chronological order, according to the date of receipt. Included in the further processing of these applications is: 1) an Interagency Border Inspection System ("IBIS") name check; 2) an FBI fingerprint check; and 3) an FBI Name Check.

According to CIS, IBIS is a "multi-agency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues, and other law enforcement systems." (Docket. No. 16, Exhibit 1, p. 9). Results of IBIS checks are usually available immediately, but the IBIS check is not deemed completed until all "eligibility issues arising from the initial system response are resolved." *Id.*

The FBI fingerprint check "generally provides information related to criminal background within the United States." *Id.* Typically, the FBI forwards fingerprint check results to CIS with 24-48 hours of receipt. *Id.* Roughly 90 percent of fingerprint checks yield no record or match with the applicant. *Id.*

The FBI Name Check is "totally different from the FBI fingerprint check." *Id.* The records checked include a variety of sources, and initial responses to this check generally take about two weeks. *Id.* Per Michael Cannon, Section Chief of the FBI's National Name Check Program, historically, approximately 68 percent of name checks submitted by CIS are electronically checked and returned within 48-72 hours as having "no record." (Docket. No. 10, Exhibit 1, p5). Remaining Name Check requests require additional, manual review. *Id.* Typically, within 30-60 days an additional 22 percent are returned as having "no record." *Id.* Of the remaining 10 percent (that have not been returned within 60 days), FBI records must be retrieved and reviewed manually. *Id.* Ultimately, less than one percent of CIS' requests are identified with a file containing *possible* derogatory information. *Id.* (emphasis added). According to the CIS, in about 80 percent of the cases, no match is found. (Docket. No. 16, Exhibit 1, p9). Of the remaining 20 percent, most are resolved within six months. *Id.* "Less than one percent of cases subject to a name check remain pending longer than six months." *Id.* "Some of the cases involve complex, highly sensitive information and cannot be resolved quickly." *Id.* An FBI Name Check is not deemed complete, even if the FBI has returned initial results to CIS, until full information is obtained, and eligibility issues arising from it are resolved. *Id.*

The FBI processes Name Checks chronologically, based on the date the request is forwarded. *Id.* at 4. CIS regularly inquires about the status of pending Name Checks, in order to see if the FBI has sent a response. *Id.* Such responses include "no record," "positive response" etc. *Id.* The responses do not provide CIS with any indication "as to what information the FBI may have relating to a particular alien, whether an FBI investigation into the particular alien has been undertaken, or whether there are national security concerns relating to that alien." *Id.*

Some FBI Name Check requests can be expedited.  *Id*.  Under CIS' policy, this can be done when an applicant meets one of four criteria:  1) military deployment; 2) age-out cases not covered by the Child Protection Act and applications affected by sunset provisions; 3) significant and compelling reasons, such as critical medical conditions; and 4) loss of social security benefits or other subsistence at the discretion of the CIS director.  *Id*.  Prior to approximately February 20, 2007, a pending mandamus action in federal court, such as the instant action, was also included as a criteria for expediting an FBI Name Check.  On or about February 20, 2007, that criteria was removed from the list.  *Id*. at 11.

The entire process, for most applicants, proceeds forward without incident.  *Id*. at 7.  Indeed, CIS' website, as of June 15, 2007, stated that it was processing I-485 applications with an application date of December 14, 2006.  Given that results of IBIS checks are usually available immediately, FBI fingerprint checks are usually returned within 24-48 hours with 90 percent "no hits," and 90 percent of FBI Name Checks are completed within 60 days, this prediction seems reasonable for approximately 90 percent of applicants.  However, due to the volume of requests, and the need for thorough screening, "some delays are inevitable."  *Id*. at 8.  "Resolving pending issues is time-consuming and labor-intensive; *some* cases take months or even *several years* to resolve."  *Id*. (emphasis added).

*Eldeeb's I-485 Application*

CIS received Eldeeb's I-485 application on July 21, 2003.  CIS created an internal file and on July 30, 2003, initiated an IBIS and other security checks.  *Id*. at 5.  The IBIS check showed a "hit" for Eldeeb as a "possibly excludable alien smuggler."  *Id*.  CIS conducted further investigation, which included contacting the specific Immigration and Customs Enforcement ("ICE") agent listed as the contact person for any inquiries about the hit.  *Id*.  This agent no longer worked for ICE at the time of inquiry, which required further investigation and delay.  *Id*.  CIS eventually determined this hit to be false, and then requested a Name Check from the FBI on June 8, 2004, nearly a year after Eldeeb filed the application.  *Id*.  CIS also scheduled an interview of Eldeeb and his wife  for August 9, 2004.  *Id*.  At the interview, CIS informed Eldeeb that his application was

awaiting a fingerprint check and security check.  *Id.*  Pursuant to its procedures, CIS has performed periodic inquiries about the status of Eldeeb's Name Check.  The most recent inquiry was performed on June 20, 2007.  *Id.*  As of that date, the status of Eldeeb's Name Check was "pending."  *Id.*  Adjudication of Eldeeb's application must wait for the results of the  FBI Name Check, and resolution of any issues that may come with those results.  *Id.*  His application cannot be expedited because Eldeeb does not meet any of the four criteria required to request expedited processing.  *Id.*

*The Delay*

The IBIS check appears to have been resolved and, thus, completed to CIS' satisfaction.  The fingerprint check is not mentioned in the record, and, by inference, is not likely holding up Eldeeb's I-485 application.  Aside from the Name Check, CIS states that all other national security background checks have been completed.  *Id.* at 5.  It appears that a satisfactory "no hit" Name Check result, or a Name Check result that requires further CIS investigation, is the only thing preventing final processing and adjudication of Eldeeb's application.

Michael Cannon, Section Chief of FBI's Name Check Program, offers some insight as to the workload under which his section is operating.  The FBI regularly performs FBI Name Checks for more then seventy outside agencies, in addition to serving its own counterintelligence, counterterrorism, and homeland security efforts.  (Docket. No. 10, Exhibit 1, p2).  Prior to 9/11, the FBI processed approximately 2.5 million Name Checks per year.  *Id.* at 6.  For fiscal year 2006, the FBI processed over 3.4 million Name Checks, a 36% increase over the pre-9/11 amount.  *Id.*  Prior to 9/11, Name Checks for the former Immigration and Naturalization Service ("INS") required searches of only "main" files.  *Id.*  In response to 9/11, the former INS Name Checks were to include "reference" files.  *Id.*  Between the 36% increase in Name Check requests processed per year, and the increased the number of files that need to be searched per Name Check for CIS, the FBI has experienced a dramatic increase in its "regular" Name Check workload.  *Id.*

However, there is more.  The same heightened security concerns that prompted the expansion of Name Check searches into "reference" files, also prompted the former INS to re-submit *2.7 million* Name Check requests to the FBI, for those individuals with

then-pending applications for immigration benefits. *Id*. (emphasis added). This was done so that the Name Checks of those applicants would meet the more stringent standards that had just been imposed. *Id*. The 2.7 million resubmitted applications hit the FBI over a two month period, including December 2002, and January, 2003. *Id*. The FBI has returned initial responses to all of the 2.7 million resubmitted applications, with approximately 84% "no hits." *Id*. This means that approximately 16% (slightly more than the historical 10%), or 440,000 Name Check results indicate that the FBI may have information relating to the applicant, and, thus, require further investigation. *Id*. The FBI is still resolving those 440,000 requests, and since the FBI processes Name Check requests in the order they are received, processing of regular Name Check submissions has been delayed. *Id*. Eldeeb's Name Check request was received in June, 2004, roughly eighteen months after the FBI received the 2.7 million resubmissions. *Id*.

Cannon states that *historically*, approximately 90 percent of Name Check requests submitted by CIS are returned within approximately sixty days with a "no hit" record. *Id*. at 5. It is not clear if these statistics do or do not include the effect of the 2.7 million resubmissions. Cannon's affidavit is silent with regard to the length of time it usually takes for the remaining 10 percent of Name Check results to be returned. CIS states that less than one percent of cases subject to an FBI Name Check remain pending more than six months. (Docket. No. 16, Exhibit 1, p9). There is no publication date on the "Fact Sheet" that includes this fact, but since it was submitted with an affidavit signed June 26, 2007, the Court will take it as a current fact.

CIS submitted Eldeeb's Name Check Request on June 8, 2004, meaning that it has been pending for just over three years. Per the FBI, historically, 90 percent of CIS Name Check requests are processed and returned as with "no hit" records within approximately sixty days. Per CIS, less than one percent of I-485 applications wait longer than six months for an FBI Name Check. This Court recognizes a certain lack of confidence in the accuracy of these numbers due to a lack of knowledge as to their recency, but they are consistent enough to establish an analytical framework. At the very least, this means that the FBI *initiates* a check on 90 percent of its Name Check requests in under sixty days. At the very most, this means that the FBI initiates a check on 99 percent of its Name Check requests in under six months. That means that the remaining

small percentage of Name Check requests are either: 1) properly initiated and require more time for investigation, or 2) are not initiated at all.  If they are not initiated at all, that means that they are either: a) still waiting in queue, unaddressed by the FBI; or b) held back behind other applications that are being initiated based on a calculated screening process;  c) arbitrarily held back, as Eldeeb alleges; or they are d) intentionally and inappropriately held back, as Eldeeb also alleges.

The fact that 90 percent to 99 percent of the Name Check requests are timely processed suggests that 100 percent of Name Check requests are initiated, and the requests without results after six months are so because those particular Name Checks require more time to investigate.  This common sense conclusion is supported through inference by all the information gathered and presented in Defendant's memoranda and affidavits, and lack of information or reasonable inference to the contrary.  It can also be shown that Name Check requests that do not return results within the six month window are likely to suffer greater delay than similarly situated Name Check requests would have many years ago, due to the FBI's current predicament.

Name Check requests that exceed the two month window usually require personal attention, which is time consuming.  Prior to 9/11, the FBI had to process roughly 10 percent of its 2.5 million Name Check requests per year by hand, which works out to approximately 250,000 Name Checks needing personal attention per year.  Currently the FBI is processing roughly 10 percent of 3.4 million requests, or approximately 340,000 requests per year.  This alone is the 36 percent increase in the annual rate, although it is still within the 10 percent historical window that the FBI had been accustomed to processing.  However, adding the 440,000 resubmissions that now require personal attention, on top of the expected 10 percent annual submissions, not only increased the gross number of applications the FBI expected to process, but since the 440,000 resubmissions needing personal attention represented approximately 16 percent of the resubmissions, it was also an increase in the percentage of submissions that required personal attention.  Although the FBI has apparently been processing these resubmissions over several years to distribute the load, an increase from 10 percent to 16 percent could represent up to a 60 percent increase in the percentage of applications that would require personal attention.  Although this affect has been attenuated because the FBI has spread

the 440,000 resubmissions out over several years, and continues to work on them, it is easy to see that Name Check submissions that require personal attention for resolution have increased disproportionately with respect to the total number of Name Check submissions, and accordingly, those applicants whose Name Checks fall into this category could incur significant delays, now more than ever.

If the Name Check requests that have not returned with timely results exist because the Name Checks were never initiated at all, Michael Cannon's discussion of the significant workload would tend to support the possibility that the Name Check requests could simply be sitting in line waiting their turn.  On the other hand, his statistics as well as those presented by CIS indicate that many of the Name Check requests are still timely processed, (although the recency of the statistics is in question, lending to some flexibility in the analysis.)  Further, it is also clear that some applications are expedited.  This is necessarily at the expense of applications already in line, meaning that some Name Check requests are definitely held back when other Name Check requests are put in front of them, but this is the result of a calculated screening process.  Whether Name Check requests without timely results exist through an arbitrary holding back, or an intentional and inappropriate holding back, i.e. whether the delay is reasonable, is the pivotal question upon which this Court will be required to render a conclusion, and that conclusion will determine the disposition of this motion to dismiss.

*Eldeeb's Complaint*

Eldeeb filed his complaint in federal court on February 6, 2007, and it was entered the same day.  Prior to approximately February 20, 2007, Eldeeb's pending litigation in federal court likely would have resulted in a routine request from CIS to the FBI to expedite his Name Check.  However, due to the removal of pending litigation into federal court as a criteria that would enable CIS to request an expedited Name Check from the FBI, Eldeeb is pursuing this action in hopes of securing an actual writ of mandamus, to force the CIS to adjudicate his I-485 application.

## MOTION TO DISMISS UNDER  RULE 12(b)(1)

**Standard of Review**

Subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) can be challenged facially or factually.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-1529 (11th Cir. 1990).  "'Facial attacks' on the complaint 'require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'"  *Id*. at 1529.  "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion."  *Id*.

"'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'"  *Id*.  This is an attack on the "trial court's jurisdiction-its very power to hear the case."  *Id*.  "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating the merits of the jurisdictional claims."  *Id*.

When a factual attack on subject matter jurisdiction implicates an element of the cause of action, the proper course of action "is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case."  *Id*.  In such instances, "the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction."  *Id*.  "This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim."  *Id*.  "A district court can still dismiss a federal claim for lack of subject matter jurisdiction whenever a decision on subject matter jurisdiction also implicates the substantive merits of the claim."  *Id* at n7.  This is so "[w]here the plaintiff's claims are 'clearly immaterial, made solely for the purpose of obtaining jurisdiction or are wholly unsubstantiated and frivolous.'"  *Id*.

**Discussion**

## JURISDICTION WITH RESPECT TO THE CITIZEN'S AND IMMIGRATION SERVICES

Prior to 1952, resident aliens who wished to become permanent residents were required to "leave the country and apply for an immigrant visa abroad." *Elkins v. Moreno*, 435 U.S. 647, 667 (1978). In 1952 Congress enacted the Immigration and Naturalizations Act, and created a mechanism for eligible aliens already present in the country to seek an adjustment of their immigration status to that of a lawful permanent resident of the United States. See 8 U.S.C. 1255(a)(2006). Pursuant to §1255(a):

> (a) Status as person admitted for permanent residence on application and eligibility for immigrant visa
>
> The status of an alien who was inspected and admitted or paroled into the United States … may be adjusted by the Attorney General, *in his discretion* and *under such regulations as he may prescribe*, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

*Id*. (emphasis added). Even when the criteria are met, the decision to adjust is still within the Attorney General's discretion. *Id*. "[A]djustment of status is a matter of grace, not right." *Elkins v. Moreno*, 435 U.S. 647 (1978). "In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion." *Id*. (emphasis omitted). Of note, "while the text of 8 U.S.C. 1255(a) refers to the Attorney General as the official who may grant an adjustment of status, the authority to adjudicate applications for adjustment of status has been transferred to the Secretary of Homeland Security and CIS." *Li v. Gonzales*, 2007 WL 1303000 (D.N.J. 2007).

Eldeeb alleges jurisdiction under: 28 U.S.C. § 1361, the Mandamus Act; 5 U.S.C. § 701 et seq., the Administrative Procedures Act ("APA") in conjunction with 28 U.S.C. § 1331, the Federal Question Statute; 28 U.S.C. § 2201, the Declaratory Judgment Act ("DJA"); and the Fifth Amendment to the U.S. Constitution. Eldeeb claims that the action is not barred by the Real ID Act, P.L. 109-113, 199 Stat 231 (May 11, 2005).

Under the Mandamus Act, Eldeeb contends that CIS is required to adjudicate his claim within a reasonable time.  Under the APA in conjunction with the federal question statute, Eldeeb contends that CIS is required, again, to adjudicate his claim within a reasonable time.  Eldeeb does not directly address the Declaratory Judgment Act, or the Fifth Amendment, other than mentioning them as two bases basis for relief in his complaint.

Defendants counter with 8 U.S.C. § 1252(a)(2)(B)(ii), which, Defendants contend, is a specific jurisdictional bar to judicial review of decisions that are within the discretion of the Attorney General and the DHS.  Defendants contend that processing and adjudication of I-485 applications is discretionary, and, since there are no timeliness of processing requirements imposed on CIS, this provision pre-empts general jurisdiction statutes, leaving district courts without subject matter jurisdiction to review the case.  Further, Defendants contend that the FBI has no duty to complete Eldeeb's Name Check within any specified timeline.  Finally, Defendants contend that the FBI has no jurisdiction to adjudicate Eldeeb's I-485 application, which is the relief sought in the complaint, and, thus, Eldeeb fails to state a claim against the FBI for which relief can be granted.

*The Jurisdictional Bar to Judicial Review of the Pace of Eldeeb's I-485 Application*

The 2005 Real ID Act's amendment of, effective May 11, 2005, provides, in relevant part:

> Notwithstanding any other provision of law…no court shall have jurisdiction to review any [] decision or action of the Attorney General or the Secretary of Homeland Security the authority which is specified under this subchapter to be in the discretion of the Attorney General or Secretary of Homeland Security.

This provision is found in the United States Code as follows:  Title 8. Aliens and Nationality, Chapter 12—Immigration and Nationality, Subchapter II—Immigration, Part V—Adjustment and Change of Status, § 1252. Judicial review of orders of removal.  Despite the provision's location under a section titled "Judicial review of *orders of removal*," some courts have broadly construed this provision as a jurisdictional bar CIS' discretionary decisions or actions related to immigration matters in general, while other

courts have narrowly construed this provision as only a limitation of judicial review of orders of removal.  Many courts have not addressed this specific bar to jurisdictional authority due to the recency of the amendment.  Additionally, there is a split of authority as to whether processing and adjudicating an I-485 application is a discretionary or non-discretionary action.  Neither the Supreme Court nor the Eleventh Circuit have addressed how this provision is to be construed and applied to the presence or absence of subject matter jurisdiction in this context.

Title 8 U.S.C. § 1252(a)(2)(B)(ii)'s jurisdictional bar may apply to CIS' discretionary decisions or actions regarding immigration matters in general, or may only apply to CIS' discretionary decisions or actions regarding removal orders.  That means that this jurisdictional bar does not apply to *any* non-discretionary decisions or actions. Therefore, to determine if this jurisdictional bar prohibits judicial review in this case, the first question this Court must address is whether the jurisdictional bar to judicial review is limited to decisions or actions regarding removal orders, or is to be more broadly construed.  If the jurisdictional bar is construed narrowly, to only prohibit judicial review of discretionary decisions and actions regarding removal orders, then this Court will have subject matter jurisdiction for CIS' other discretionary decisions and actions, as well as CIS' non-discretionary decisions and actions.  This would give this Court judicial review authority in this case, as this case does not involve a discretionary decision or action regarding a removal order.

If the jurisdictional bar is construed broadly, to prohibit judicial review of all of CIS' discretionary decisions and actions, then this Court would only have subject matter jurisdiction for CIS' non-discretionary decisions and actions.  If so construed, the next question would then become whether the pace of processing and adjudicating I-485 applications is discretionary or non-discretionary.  If the pace of processing and adjudicating I-485 applications is discretionary, then this Court would not have subject matter jurisdiction.  If the pace of processing and adjudicating I-485 applications is non-discretionary, then this Court would have subject matter jurisdiction.

Under the current circumstances, a compelling authority must include convincing arguments for both components in its analysis; otherwise the analysis is incomplete, because there is a split of authority on both questions.  If controlling authority cannot be

found in a single case, or cases, this Court will split the question and look for compelling authority on each question, and then apply those to the question of whether the jurisdictional bar removes subject matter jurisdiction from this Court.

Finally, it is important to note that later analysis will show that although the jurisdictional bar may apply, certain circumstances can change a discretionary decision or act into a non-discretionary decision, removing the jurisdictional bar to judicial review.

The question of subject matter jurisdiction has been posed, as far as this Court can determine, to the U.S. District Court for the Middle District of Florida twice. The Orlando Division first addressed whether it had jurisdiction in a situation similar to the instant situation in June, 2006, in *Zahani v. Neufeld*. *Zahani v. Neufeld*, 2006 WL 2246211 (M.D. Fla. 2006). In *Zahani*, the plaintiff's brought a complaint for writ of mandamus seeking the court to compel the government to adjudicate the adjustment of status application for lawful permanent residence. CIS contended that the court lacked subject matter jurisdiction under 8 U.S.C. § 1252(g), as opposed to lacking jurisdiction under the current provision. *Id*. Pursuant to 8 U.S.C. § 1252(g), the courts lacked authority to review "the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute *removal orders* against any alien under this chapter." *Id*. (emphasis added). The court concluded that this provision had "nothing to do" with removal orders, and, thus, the provision did not apply. *Id*. The cases that the court relied on in reaching that decision were all decided prior to the 2005 amendment that created the current provision in question. In the *Zahani* provision the words "removal order" were contained within the words of the provision itself. In the current provision, the words "removal order" are contained in the title to the section in which the provision resides, but not in the words of that particular provision.

The Orlando Division again addressed the current provision, this time in October, 2006, in *Gemini Realty, Inc. v. Gonzalez*. *Gemini Realty, Inc. v. Gonzalez*, 2006 WL 2927562 (M.D. Fla. 2006). The Orlando Division noted that there was a split of authority in federal courts as to whether CIS' decision not to immediately act on a nonimmigrant visa application petition is an inherently discretionary decision as to which judicial review was barred under 8 U.S.C. § 1252(a)(2)(B)(ii). *Id*. Similar to the instant

case, the question was whether the provision should be limited to removal orders, or expanded to include other CIS' discretionary decisions.  That court declined to address the question, as it was able to resolve the issue on other grounds.  *Id*.  This appears to be a case of first impression in this district.  Therefore, this Court looks to other authority about presence or lack of subject matter jurisdiction for this type of action.

In March, 2007, the U.S. District Court for the Southern District of Florida addressed whether district courts had jurisdiction in such cases in *Tjin-A-Tam v. U.S. Department of Homeland Security*.  *Tjin-A-Tam v. U.S. Department of Homeland Security*, 2007 WL 781339 (S.D. Fla. 2007).  In *Tjin-A-Tam*, the plaintiff filed an I-485 application at almost the same time as Eldeeb.   Without any reference to the 8 U.S.C. § 1252(a)(2)(B)(ii) jurisdictional bar, the court cited 28 U.S.C. 1361, the Mandamus Act, as its basis for jurisdiction.  *Id*.  The court said that "contrary to the Respondent's assertions, district courts possess mandamus jurisdiction over petitions to compel the Department of Homeland Security to adjudicate adjustment of status applications within a reasonable time period."  *Id*.  The court then cites three cases in support of its position.  One of the cases was decided in 1999, and another in 1998, and neither of those discuss the jurisdictional bar.  The third case, *Elkhatib v. Butler*, a June 6, 2005 Southern District case, does not consider the jurisdictional bar either.  *Elkhatib v. Butler,* 2005 WL 5226742 (S.D. Fla. 2005). Consequently, *Tjin-A-Tam* and *Elkhatib* are not compelling to this Court regarding whether this Court has subject matter jurisdiction in this action.

In March, 2007, the Southern District of Florida again addressed the question in *Grinberg v. Swacina*.  *Grinberg v. Swacina*, 478 F.Supp.2d 1350 (S.D. Fla. 2007).  In *Grinberg*, a foreign citizen sought "an order compelling the representatives of a United States government agency to adjudicate his application for adjustment of status to become a permanent United States citizen."  *Id*.  The plaintiff in *Grinberg* was unhappy with the pace at which his immigration adjustment decision was being made.  *Id*.  The plaintiff alleged jurisdiction under the Mandamus Act, the Administrative Procedures Act, in conjunction with the federal subject matter jurisdiction statute, and under the Declaratory Judgment Act, just as Eldeeb does.  The court "elected to follow the majority of courts that have dismissed similar actions for lack of subject matter jurisdiction" based on the 1252(a)(2)(B)(ii) jurisdictional bar.  *Id*.  The court construed the 1252(a)(2)(B)(ii)

jurisdictional bar provision broadly, to include more than just removal orders, and then found that Congress intended to include pace of processing such applications within CIS' discretionary functions.

In addressing whether to construe the 1252(a)(2)(B)(ii) jurisdictional bar narrowly or broadly, the Grinberg court cites, among others, *Safadi v. Howard*, 466 F.Supp.2d, 696 (E.D.Va. 2006). *Safadi* in turn cites *El-Khader v. Perryman*, 264 F.Supp.2d 645, 649 (N.D.Ill. 2003). *El-Khader* discusses the pre-2005 revision to the 1252(a)(2)(B)(ii) jurisdictional bar, and reaches the same conclusion that *Blacher v. Ridge* did when it discussed the post 2005 revision 1252(a)(2)(B)(ii) jurisdictional bar, using the same rationale. *Blacher v. Ridge*, 436 F.Supp.2d 602 (S.D.N.Y. 2006). (The 2005 revision to the jurisdictional bar added the language "notwithstanding any other provision of law," or reliance on prior cases.) In *Blacher*, the court noted that the literal interpretation of the jurisdictional bar, when read alone, might seem to limit judicial review to removal orders only. *Id*. However, when read in context with the rest of the statute, and with precedent regarding interpretation of statutes, the court found that it applied broadly:

> The heading of a statute section, however, does not limit the plain meaning of the text of the statute because headings are "[f]or interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase" and should be used as "tools available for the resolution of doubt." The heading for section 1252 "appears to have a broader scope than simply setting forth the jurisdictional limits of review of orders of removal." The Supreme Court stated that "protecting the Executive's discretion from the courts ... can fairly be said to be the theme of the [IIRIRA] legislation."

*Id*. at 607 (internal citations omitted). The court held that the jurisdictional bar deprived it of authority to review the denial of an H1-B visa. *Id*. Of note, *Blacher* involved a denial of authority to review a *final decision*, as opposed to the question of the pace of reaching a final decision.

To these reasons supporting a broad interpretation, the Defendants add historical and policy considerations and notes that the Supreme Court has stated: [t]he power of congress to exclude aliens altogether from the United States, or to prescribe terms and conditions upon which they may come to this country, and to

have declared policy in that regard enforced exclusively through its executive officers, without judicial intervention, is settled by our previous adjudications." *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972). This Court accepts that the provision can be interpreted broadly, to include more than just removal orders, and that it is appropriate to do so, in light of the context.

In addressing whether the pace of an adjudication is discretionary or non-discretionary, the *Grinberg* court again refers to the reasoning of, among others, the *Safadi* court. The § 1252(a)(2)(B)(ii) jurisdictional bar excludes from judicial review "any other decision or action." The pivotal word in that phrase is "action," and the *Safadi* court cites Black's Law Dictionary to define "action" as "an act or series of acts." Black's Law Dictionary 28 (6th ed. 1990). It states that accordingly, the jurisdictional bar applies to "'any act or series of acts' that is discretionary within the adjustment of status process." *Safadi*, 466 F.Supp.2d at 699. As such, and because § 1255 does not impose any limits on CIS' discretionary authority over the adjustment of status process, "action" means the entire process of reviewing an adjustment application, including the pace of review, and that includes the completion of background and security checks. *Id*.

Other courts have reached the opposite conclusion, holding that CIS has a non-discretionary duty to process applications within a reasonable time, and, thus, the courts have mandamus jurisdiction. *See e.g. Gelfer v. Chertoff*, WL 902382 *2 (N.D. Cal. 2007); such cases conclude with such holdings, that without jurisdiction, CIS would be free to delay adjudicating applications indefinitely. *Id*. Indeed, the *Grinberg* court alludes to inaction as a different situation than what it was contemplating, and the *Safadi* court also notes that it did not address a situation where the CIS altogether refused to process an application. The split then appears to really be what is a reasonable processing time, and when the courts have jurisdiction with respect to that question.

Courts that take subject matter jurisdiction over the pace of processing an application, by calling the pace of processing an application a non-discretionary act, call an acceptable pace a "reasonable pace." *Qui*, 2007 U.S. Dist. LEXIS 47940 at *8. Courts that do not take subject matter over the pace of processing an application call an

acceptable pace a pace that is faster than that which is tantamount to a refusal to process the application. *See Safadi*, 466 F.Supp.2d at 700. If CIS is acting reasonably, courts with jurisdiction would take no action, and courts without jurisdiction could take no action. If CIS is acting so unreasonably as to be tantamount to a refusal to act on an application, then all courts would have jurisdiction and would act accordingly. Only in the case of a marginally unreasonable pace is there the possibility that jurisdiction courts would take action, which non-jurisdiction Courts would not.

Contrary to the *Qui* court's opinion, it is not internally inconsistent for this Court to approach this subject this way. *Qui*, 2007 U.S. Dist. LEXIS 47940 at *8. ("However, some of these courts' decisions are internally inconsistent in that they conclude that courts do not have jurisdiction to review the reasonableness of the pace of processing I-485 applications as long as the agency 'is making reasonable efforts,' thereby implying that a court does have some authority to review the reasonableness of the agency's efforts'"). Perhaps this is due to the choice of courts on both sides of the fence to use the word "reasonable" to describe different things. This Court is looking for evidence of a lack of *effort* on the part of the governmental agency, not for evidence of a *pace* that is unreasonable. This Court can review an agency's efforts, and it does so by looking *solely* at the agency's actions which it has a non-discretionary duty to perform. Only if there are no actions, or actions tantamount to a refusal to act, can this Court look further. A governmental agency can be expending tremendous efforts and still only be acting at a pace that the applicant would consider unreasonable. Reasonable, as defined by the governmental agency, is much different than reasonable as defined by the applicant. Reasonableness of pace, as defined by the government, and by this Court, is defined by the effort put forth by the agency and the size of the task at hand. Reasonableness of pace, as defined by the applicant, is defined more by the amount of time that has elapsed since initial filing of his or her individual matter.

In this Court's opinion, government efforts should control the pace of processing such an application. If the government is putting forth a reasonable effort, which can be (and indeed is, in this Court's approach) measured by the actions that it takes, then the resulting pace is what it is, whatever it may be. When a court attempts to increase the pace of the agency, either the agency will have to expend much more effort to

accommodate, quite possibly a disproportionate amount of effort on that particular item, or it will not be able to effectively complete its task.  In the case of a national security investigation, not completing the task, or not completing it thoroughly, is not an acceptable result, particularly because Congress has mandated their completion in such cases.  Given the deference usually given to the executive branch in immigration matters, it is not this Court's place to judge the efficiency with which a governmental organization processes such work.  *See Shalabi v. Gonzales*, 2006 WL 3032413, *5 (E.D. Mo. 2006).  When rendering an opinion about the reasonableness of an agency's pace when processing an application, a court is doing just that.  It is not this Court's place to decide for the executive branch that it needs to hire more CIS employees to process I-485 applications, or more FBI employees to perform background checks.  That decision is theirs.

Accordingly, this Court is looking for a 1) refusal to act, or 2) acts that are *so* unreasonable as to be tantamount to a refusal to act.  It is obvious to look for a refusal to act, and it is necessary for Court to look for a acts that are so unreasonable as to be tantamount a refusal to act, to prevent the unlikely scenario where an agency intentionally tries to circumvent the action requirement by performing meaningless acts.  Otherwise, the pace is the province of the agencies involved, and the organizations that staff them.  If there are any deficiencies within these agencies, such as a shortage of personnel, Congress is the proper authority to determine that and it is empowered to correct it, if it wishes to.

Therefore, this Court has elected to interpret the § 1252(a)(2)(B)(ii) jurisdictional bar broadly, and has concluded that the pace of adjudication of an I-485 application is a discretionary function of the CIS.  Therefore, if Eldeeb's application has not been adjudicated because the pace is slow, but the CIS is still acting on it, then this Court is without subject matter jurisdiction to review the matter.  However, if Eldeeb's application has not been adjudicated because of inaction, or acts so unreasonable as to be tantamount to a refusal to process his application, this Court has jurisdiction.

*When this Court Has Jurisdiction for I-485 Applications*

There are actually three possible duties intertwined in the instant application scenario; 1) a duty to *act* on an I-485 application; 2) a duty to maintain a reasonable *pace* while processing the application; and 3) a duty to *adjudicate* an application.  A duty to *adjudicate* would necessarily include a duty to *act* on an application.  (Of note, a duty to adjudicate would not mean a duty to reach a particular disposition; it would only mean a duty to reach a disposition.)

Due to the jurisdictional bar, in order for the courts to have jurisdiction over a refusal to act on the application, there must me a non-discretionary duty to act on the application.  That does not mean a duty to reach a certain decision, or a duty to expediently process an application, simply a duty to act on the application, and a duty to ultimately reach a decision.

According to *Yu v. Brown*, all the courts addressing this question have held that CIS has a non-discretionary duty to process applications for legal permanent resident status, as well as all other immigration applications.  *Yu v. Brown*, 36 F.Supp.2d 922, 931 (D.N.M. 1999).  The fact that this case is pre-2005 is not relevant here because it is not being cited for the application of the jurisdictional bar to the pace of processing an application.  It states that *acting* on such applications is a non-discretionary duty of the CIS, outright stating a point that had to be assumed in order to proceed with the question of pace earlier.

Defendants point to *Qui v. Chertoff*, which distinguishes between a duty under 8 C.F.R. § 245.2 to inform of adjudication decisions *once made*, and a duty to adjudicate an application.  *Qui v. Chertoff*, 486 F.Supp.2d 412 (D.N.J. 2007). *Qui* explores the duty to adjudicate and cites 8 C.F.R. § 103.2(b)(18), which is entitled "Withholding adjudication," in an effort to show that there is no duty to adjudicate.  *Qui* notes that none of the cases that have held that there is a clear duty to process I-485 applications have referred to this section.  *Id*.  8 C.F.R. § 103.2(b)(18) allows a district director to withhold adjudication under certain circumstances, and the *Qui* court, thereby, infers that extends to the right to withhold adjudication altogether.  *Id*.  Properly read, this section allows a district director to withhold adjudication during a pending investigation, and further,

allows a district director not to inform the applicant of the investigation if doing so would prejudice the ongoing investigation. *Id.* By its very words, this section implies that an adjudication is expected unless certain circumstances are met. *Qui* does not successfully show that there is no duty to adjudicate. It only shows that adjudication can be withheld under certain circumstances. Furthermore, the entire discussion about whether there is a discretionary or non-discretionary duty to process applications at a certain pace would only be necessary if there was an underlying duty to process applications. Therefore, this Court recognizes that there is a non-discretionary duty to adjudicate I-485 applications, and attendant with that is a non-discretionary duty to act on I-485 applications.

To summarize, CIS has a non-discretionary duty to *act* on an application, a discretionary duty as to the *pace* of processing the application, and a non-discretionary duty to *adjudicate* an application. Therefore, there are five possible scenarios that exist regarding CIS' duty with respect to such applications. CIS could: 1) act on an application, in which case this Court would have no jurisdiction; 2) refuse to act on an application, for example, refuse to accept an application, in which case this Court would have jurisdiction; 3) delay an application so unreasonably as to be tantamount to a refusal to act, in which case this Court would have jurisdiction; 4) complete processing but refuse to adjudicate, akin to a refusal to act, in which case this Court would have jurisdiction; and 5) adjudicate, in which case this Court would not have jurisdiction, including over which decision was reached. Scenarios 2, 3, and 4, which are refusals to act, or actions that are tantamount to refusal to act, are the only possible scenarios in which this Court would have jurisdiction, as they are based on a non-discretionary duty to which the judicial review bar does not apply. Conversely, in scenarios 1 and 5, this Court would have no jurisdiction, because the judicial review bar does apply. However, it is important to note that CIS can start processing an application, such as in scenario 1, where this Court would have no jurisdiction, and then move to scenario 2, where this Court would have jurisdiction, in the unlikely event it ceased processing an application for no valid reason.

In most cases, prior to final adjudication, it is not likely that an applicant will know which of the first four scenarios applies to his application, for several reasons.  For example, in the unlikely event that either the CIS or FBI is refusing to process an application, or delaying so long as to be tantamount to a refusal to process, neither is likely to report that fact.  Further, if either agency is conducting an investigation that is causing an understandable delay, neither is likely to inform the applicant that he is the subject of a national security investigation, for obvious reasons.  Unfortunately, this leaves the applicant in a state of uncertainty, which inevitably results in frustration, and the occasional complaint for a writ of mandamus.

*Determining if this Court Has Jurisdiction Regarding an I-485 Application*

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction factual attack requires a court to determine if it has jurisdiction to even hear the case itself.  *Lawrence*, 919 F.2d 1528-1529.  In order to accomplish this, a court is allowed to look outside the pleadings to things such as testimony and affidavits.  *Id*.  Therefore, in order to determine if this Court has subject matter jurisdiction, the Court will look for evidence to see whether CIS is acting on the application, refusing to act on the application, or delaying so unreasonably as to be tantamount to a refusal to act on the application.  If CIS is acting on the application, this Court will have no subject matter jurisdiction.  If, however, this Court finds that CIS is not acting on the application, or so unreasonably delaying as to be a refusal, it will take subject matter jurisdiction.

Two scenarios govern this determination:  1) there is enough evidence within the materials available to this Court to determine whether it has jurisdiction;  2) there is not enough information in the materials available to this Court to determine if it has jurisdiction.  In the first case, regular Rule 12(b)(1) procedures govern, as this Court can make a determination as to jurisdiction based on the evidence.  It will either be clear that CIS is acting on the application, or is not acting.

In the second scenario there is a twist.  In this scenario there may not be enough information for this Court to tell if it has subject matter jurisdiction or not. Similar to the applicant's predicament, if an agency is refusing to process an application, it is not likely to report this to a Court.  If it is acting on the application, but the application process is moving slow due to, for example, an investigation into an applicant's background, the agency may not reveal this to a court either, for obvious reasons.

In this second scenario, under the traditional Rule 12(b)(1) standard, a court would either have to guess if it had subject matter jurisdiction, based on insufficient facts, or take subject matter jurisdiction over a matter that it may ultimately find that it never had subject matter jurisdiction over to begin with. (As in the case where an application is being acted upon, but an unusually long investigation of the applicant was slowing the progress of the application, which is outside the jurisdiction of district courts.)  In this type of scenario, the same facts that govern whether a court has subject matter jurisdiction could prove an element of the applicant's action if brought under the APA or the Mandamus Act. For example, under the APA Act, liability only exists when an agency *fails to take action* it is required to take, so if CIS fails to act, which determines subject matter jurisdiction, it also violated the APA.  Similarly, under the Mandamus Act, liability only exists if no action is being taken.  If an agency is refusing to act on an application, then a court would have jurisdiction, but proving that would simultaneously prove an element of the applicant's case.

The Eleventh Circuit has addressed exactly such scenarios in *Lawrence*. The court in Lawrence vacated a district court's ruling because the district court had dismissed a claim for "lack of subject matter jurisdiction when that determination [was] intermeshed with the merits of the claim and when there [was] a dispute as to a material fact."  *Lawrence*, 919 F.2d 1530.  In *Lawrence*, the plaintiff brought a tort claim against a federal employee who was involved in an automobile accident.  *Id.*  Whether the defendant was acting within the course and scope of his federal employment would determine if the district court had jurisdiction, and would resolve a necessary element of the tort claim.  *Id.*

Similarly, in a case under scenario two, jurisdiction would be established only if an agency is refusing to process an application, or delaying so long as to be a refusal to process.  Establishing this would establish an element of the applicant's claim under APA, for example.  Hence, in these situations, determination of subject matter jurisdiction is intertwined with the merits of the case.

In such cases, the Eleventh Circuit has reasoned that such attacks on subject matter jurisdiction are indirect attacks on the merits of the case itself.  *Id.*  The court thus "adopted a summary judgment standard in evaluating Rule 12(b)(1) motions that also implicate the merits of a claim."  *Id.*  It did this to offer the "full panoply" of protections afforded the party opposing such motions, as they were really indirect attacks on the merits of their case.  *Id.*

Under the traditional Rule 12(b)(1) standard, there is no presumptive truthfulness to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating the merits of the jurisdictional claims. *Lawrence*, 919 F.2d 1528-1529.

If this Court receives enough information to determine that it does *not* have jurisdiction, it obviously need not look to see if it does have jurisdiction.  If a Court does not receive enough information to convince it that it did not have jurisdiction over CIS, it would have had to apply a Rule 56 summary judgment standard to see if it did have jurisdiction, as discussed below.  Under the Rule 56 summary judgment standard, the Court would only have to determine if there was a genuine issue of material fact based on the totality of the evidence presented, per Fed.R.Civ.P. 56(c), and evidence presented would have to be construed in favor of the non-moving party, which would receive the benefit of all favorable inferences that could be drawn from that party's evidence.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Application of this standard gives the non-moving party a much greater level of protection.

Therefore, in order to determine if this Court has subject matter jurisdiction over adjudications that have been delayed, it will first apply the traditional Rule 12(b)(1) standard, where it can weigh the evidence for itself.  As discussed above, it is unlikely that the Court will find that the evidence grants it

subject matter jurisdiction, so the inquiry will most likely only determine that the Court does not have jurisdiction.  If CIS shows that it is acting on the application, and is not delaying so unreasonably as to constitute a refusal to act, a showing which can be made rather easily by CIS, then this Court will have no subject matter jurisdiction.

If CIS does not make such a showing, then the Court will have to attempt to determine if it has subject matter jurisdiction. In the cases where the determination of subject matter jurisdiction is intertwined with the elements of the cause of action under which relief is sought, such as the actions brought under the APA or under the Mandamus Act, the Court would have to change its standard of review to that of a summary judgment review.

*The Jurisdictional Bar With Respect to the Pace at Which CIS is Processing Eldeeb's Application*

As noted in Eldeeb's Memorandum in Opposition to Dismiss, other than his interview, over a year after he filed his application, he was unaware of any action that had been taken on behalf of his application.  The Court, however, has been presented with more information to evaluate.

CIS received Eldeeb's I-485 application on July 21, 2003, created an internal file and on July 30, 2003, initiated an IBIS and other security checks.  The IBIS check showed a "hit" for Eldeeb as a "possibly excludable alien smuggler."  CIS conducted further investigation, which included contacting the specific Immigration and Customs Enforcement ("ICE"), and eventually determined this hit to be false.   CIS then requested a Name Check from the FBI on June 8, 2004, nearly a year after Eldeeb filed the application.  CIS also scheduled an interview of Eldeeb and his wife  for August 9, 2004.  In fact, other than the Name Check, an attendant processing, CIS has completed processing Eldeeb's application.  Pursuant to its procedures, CIS continues to perform periodic inquiries about the status of Eldeeb's Name Check.  The most recent inquiry this Court is aware of was performed on June 20, 2007.  As of that date, the status of Eldeeb's Name Check was "pending."  Adjudication of Eldeeb's application must wait for the

results of the  FBI Name Check, and resolution of any issues that may come with those results.

Eldeeb, in the understandable predicament any applicant is in, has not produced any evidence to show that CIS has not acted, has stopped acting, or has delayed so unreasonably long as to be a refusal to act on his application.  Given the facts presented by the Defendants, which this Court finds credible, Eldeeb could not produce contrary facts with respect to CIS.

This Court finds that CIS has acted and continues to act on Eldeeb's application to the extent it can.  CIS is currently awaiting the results of his background check, which the FBI is responsible for performing.  Since completion of a background check is such a critical step in the processing of an application, CIS cannot adjudicate his application without it.   Therefore, the jurisdictional bar is in force with respect to the pace at which CIS is processing Eldeeb's application.

*Jurisdiction over the Pace at Which CIS is Processing Eldeeb's Application*

Eldeeb's complaint claims jurisdiction under:  1) 28 U.S.C. § 1361, the Mandamus Act; 5 U.S.C. § 701 et seq.; 2) the Administrative Procedures Act ("APA") in conjunction with 28 U.S.C. § 1331, the Federal Question Statute;  3) 28 U.S.C. § 2201, the Declaratory Judgment Act ("DJA"); and 4) the Fifth Amendment to the U.S. Constitution.  Eldeeb claims that the action is not barred by the Real ID Act, P.L. 109-113, 199 Stat 231 (May 11, 2005), which has been addressed in this order as the § 1252(a)(2)(B)(ii) jurisdictional bar.  Since the jurisdictional bar is in force with respect to Eldeeb's application, the question then becomes whether it precludes the causes of action listed in Eldeeb's complaint.

Although Eldeeb's complaint alleges these four bases of jurisdiction, it does not delineate the claims.  The text of the complaint, and of the Memorandum in Opposition to Defendant's Motion to Dismiss, however, clearly indicate that Eldeeb is seeking relief under the Mandamus Act, the Administrative Procedures Act, and the Declaratory Judgment Act.  Therefore, those are the causes of action that this Court will discuss.

Regarding the jurisdictional bar, "[i]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or

limits jurisdiction." *Danilov v. Aguirre*, 370 F.Supp.2d 441, 445 (E.D. VA 2005).  The §

1252(a)(2)(B)(ii) jurisdictional bar is a specific limitation of jurisdiction, while the

Mandamus Act, Administrative Procedures Act, and the Declaratory Judgment Act are

general jurisdiction statues.  Therefore, where it applies, it's limitation of jurisdiction will

trump a general jurisdiction statute's grant of jurisdiction.

The Mandamus Act

Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of

any action in the nature of mandamus to compel an officer or employee of the United

States or any agency thereof to perform a duty owed to the plaintiff."

> Mandamus relief is only appropriate when:  1) the plaintiff has a clear
> right to the relief requested; 2) the defendant has a clear duty to act; and 3)
> 'no other adequate remedy [is] available.'  Put another way, a writ of
> mandamus "is intended to provide a remedy for a plaintiff only if he has
> exhausted all other avenues of relief and only if the defendant owes him a
> clear nondiscretionary duty."

*Cash v. Barnhart*, 327 F.3d 1252, 1257 (11th Cir. 2003).

Eldeeb meets the criteria to apply for an I-485 change of status.  As a

qualified applicant, he has a right to have CIS act on his application because CIS

has a non-discretionary duty to him to act on his application.  CIS has acted on his

application.  He also has the right to have his application adjudicated once CIS

has completed all required processing, because CIS has a non-discretionary duty

to him to adjudicate his application once all required processing is complete.

This question has not been reached yet because CIS cannot complete all required

processing until the FBI returns the results of the name check; however there is

nothing in the record to suggest that CIS will not adjudicate his application once

all required processing has been completed.  He does not have a right to action on

his application at a certain pace, i.e. faster, because pace falls under the discretion

of CIS.  Since pace is discretionary, CIS has no duty to Eldeeb to process his

application at a certain pace.  Absent such a duty, and any attendant right Eldeeb

would have, this Court is without jurisdiction under the Mandamus Act to review

the pace at which CIS is processing his application.  Further, only if the

Mandamus Act had granted jurisdiction to district courts over discretionary acts,

in addition to the non-discretionary duties it does claim, would the jurisdictional bar be invoked.  *See Safadi*, 466 F.Supp.2d at 700.  The Mandamus Act, however, politely limits itself to duties that an agency may owe, i.e. non-discretionary duties.  Therefore, with respect to a district court's subject matter jurisdiction under the Mandamus Act, the § 1252(a)(2)(B)(ii) jurisdictional bar is superfluous.

This Court, therefore, does not need to address the factual question of whether Eldeeb's predicament is so dire that it would be proper for this Court to issue a writ of mandamus.

The Administrative Procedures Act

The APA, together with 28 U.S.C. 1331, the federal question statute, may confer jurisdiction on federal district courts, over a claim that an agency has violated the APA. *Califano v. Sanders*, 430 U.S. 99,  105 (1977).  The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Among the agency actions subject to review is "agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Further, the APA requires that "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."  5 U.S.C. § 555.

However, the APA also provides that it applies except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to judicial discretion by law.  5 U.S.C. § 701(a)(1)-(2).  As discussed above, Eldeeb's only viable complaint at this point is the pace at which CIS is processing his application.  However, the pace at which CIS processes an application has been found to be a discretionary duty of the CIS. Absent a non-discretionary duty in the instant case, under § 701(2), this Court is without jurisdiction under the APA to review the pace at which CIS is processing his application. Again, similar to the situation with the Mandamus Act, the APA has limited itself to non-discretionary duties an that an agency may owe.  For the same reasons as with the Mandamus Act, with respect to a district court's subject matter jurisdiction under the APA, the § 1252(a)(2)(B)(ii) jurisdictional bar is superfluous.  *See Safadi*, 466 F.Supp.2d at 700.

The Declaratory Judgment Act

The DJA, 28 U.S.C. § 2201, states in relevant part that " [I]n a case of actual controversy *within its jurisdiction*…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added).  Although the DJA enlarged the range of remedies available in federal courts, it did not extend federal courts' jurisdiction.  *Li v. Chertoff*, 482 F. Supp. 2d 1172, 1179 (S.D. Cal. 2007) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950)).  *See also Keane v. Chertoff,* 419 F.Supp.2d 597, 599 (S.D.N.Y. 2006).  The DJA is a procedural statute, not a jurisdiction granting statute. *Li*, 482 F.Supp.2d at 1179. "The use of the declaratory judgment statute does not confer jurisdiction by itself if jurisdiction would not exist on the face of a well-pleaded complaint brought without the use of 28 U.S.C. § 2201." *Id.* citing *Janakes v. U.S. Postal Service*, 768 F.2d 1091, 1093 (9th Cir. 1985).  Since this Court has previously concluded that it does not have an independent basis for jurisdiction in this case under the Mandamus Act, or under the APA, and because the DJA does not confer jurisdiction itself, this Court is without jurisdiction under the DJA to review the pace at which CIS is processing his application.

With respect to the pace at which CIS processes an I-485 application, this Court is without subject matter jurisdiction under the Mandamus Act, the Administrative Procedures Act, and the Declaratory Judgment Act.  Therefore, with respect to Michael Chertoff, Secretary of The Department of Homeland Security, Emilio Gonzalez, Director, United States Citizenship and Immigration Services, and Andrea Quarantillo, District Director, United States Citizenship and Immigration Services, Defendants' Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is **GRANTED**.

It is of note that this Court would most likely have reached this decision regardless of whether it took the jurisdiction approach, where it assumed jurisdiction and then ruled on the reasonableness of the pace, or the non-jurisdiction approach, where it looked for action before determining jurisdiction, as in this case.  To illustrate the point, this Court will compare the two approaches.  Courts under both approaches will take no actions when there is a reasonable "pace."  Both courts take jurisdiction when there is a

refusal to act on an application.  The divergence is over the level of unreasonableness of "pace" on which a court can act.  As discussed earlier, there are two types of unreasonable pace:  marginally unreasonable, and so unreasonable as to be tantamount to refusal to act.  In theory, courts that assume subject matter have jurisdiction have jurisdiction over an application that has a marginally unreasonable pace of processing.  In theory, courts that do not take jurisdiction would not take jurisdiction over such cases, as the pace is not so unreasonable as to be tantamount to a refusal to act.  Had this Court taken the other approach, it would have assumed jurisdiction, denied the Rule 12(b)(1) motion to dismiss, awaited the motion for summary judgment, and granted it.  This would have been so because, with respect to CIS, this Court cannot see how reasonable minds could differ as to whether CIS was acting on the application, based on the facts of this case, and as noted, Eldeeb could not likely have produced any more facts to convince this Court otherwise.  As such, this is not even a case of marginal unreasonableness, that could survive under the jurisdiction approach.

This Court would also like to point out that although there exists a theoretical difference between the two approaches, realistically, the difference in results between the two approaches will likely distill down to procedural differences.  This, in turn, under this Court's approach, ends up being, effectively, a presumption in favor of governmental agencies.  This is so because, under the approach taken by this Court, district courts will have jurisdiction over cases where the actions are tantamount to a refusal to act.  As with all standards, Courts are to interpret this based on the facts at hand.  This means, in reality, that a court is likely to take action when it feels an application is not being acted upon properly, which, is exactly the time a court that assumes jurisdiction is likely to act as well.  Under this Court's approach, because of the procedural mechanisms, a governmental agency will be able to avoid litigation if it can show, up-front, that it is taking action on an application.  If a court is skeptical, however, it can take jurisdiction, pursue the facts further, and then decide the issue on a motion for summary judgment.  Under the jurisdiction approach, courts must reach summary judgment before deciding the case.  This Court's approach encourages government agencies to take action on applications, and to demonstrate up-front that it has taken action.  If it does so, it will be able to avoid litigation more readily, which saves the government agency and the courts

resources.  This Court's approach effectively represents a more conservative approach for *determining* what pace is unreasonable.  Such deference is in accord with the deference given the executive branch in immigration matters.  *Shalabi*, 2006 WL 3032413 at *5.

## JURISDICTION WITH RESPECT TO THE FEDERAL BUREAU OF INVESTIGATION

So far this Court has spend a significant amount of time discussing CIS, but the agency that is responsible for the item that is delaying Eldeeb's application is the FBI, not CIS.  CIS would probably rather process Eldeeb's application and get it "off their books," but it cannot, because the FBI has exclusive control of Name Checks, and CIS cannot adjudicate an application until a Name Check is performed.  Consequently, CIS must await the FBI, and must endure the threat of similar lawsuits and the defense thereof, for an item outside its control.  The FBI has been named in this action, as well as in prior actions.  Not surprisingly, befitting the tradition created by the other issues in this case, there is a split of authority as to whether the FBI can be held accountable.

*The Jurisdictional Bar and the FBI*

The 8. U.S.C. § 1252(a)(2)(B)(ii) jurisdictional bar includes "any decision or action of the Attorney General or the Secretary of Homeland Security."  The Secretary of Homeland Security is responsible for CIS, and as such the bar applied to CIS.  The Attorney General is responsible for the FBI, and as such, the jurisdictional bar applies to decisions and actions of the FBI as well.  However, as discussed earlier, both the Mandamus Act and the Administrative Act render the § 1252(a)(2)(B)(ii) jurisdictional bar superfluous, because the Acts limit themselves to the same jurisdiction that the jurisdictional bar would.  For purposes of the issue at hand, this Court only needs to address whether the Mandamus Act or the Administrative Procedures Act grant jurisdiction to district courts regarding the pace of processing an I-485 application.  From that it can make a determination regarding the Declaratory Judgment Act, and then render a decision in this order with respect to the FBI.

Mandamus Act

Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." The duty must be a "clear duty." *Cash v. Barnhart*, 327 F.3d 1252, 1257 (11th Cir. 2003). As before, whether this Court has mandamus jurisdiction in this action is determined by whether the FBI owes a clear, non-discretionary duty to Eldeeb.

The mechanisms that create duty on the part of the FBI are different than the mechanisms that created duty for CIS. CIS is required, by statutes and precedent, to adjudicate, and thereby process, Eldeeb's application. The FBI does not adjudicate applications, so it has no duty to do so. The question then becomes whether the FBI has a duty to process its part of the application process, and if it has a duty to do so, is the pace of that process discretionary or non-discretionary. Then the question becomes whether that duty is owed to Eldeeb, or to CIS.

The court in *Shelabi v. Gonzalez* found that the FBI had no "clear, non-discretionary duty," because there is no statute or regulation that imposes such a duty. *Shelabi*, 2006 WL 3032413 at *5. *See also Konchitsky v. Chertoff*, 2007 WL 2070325 (N.D.Cal. 2007) ("courts squarely addressing the issue of whether they have jurisdiction to compel the FBI to perform name checks in connection with adjustment of status petitions have overwhelmingly concluded that they do not"); *Sozanski v. Chertoff*, 2006 WL 4516968 (N.D.Tex.2006) (holding the court did not have jurisdiction to order defendants to perform the FBI name check); *Zaytsev v. Gantner*, 2004 WL 2251665, at *1 (S.D.N.Y.2004) (the court found no authority whereby the FBI owes a duty to conduct background checks).

The sole authority to the contrary is the court in *Kaplan v. Chertoff*. *Kaplan v. Chertoff*, 481 F.Supp.2d 370 (E.D. Pa. 2007). In *Kaplan*, the court found that Congress has, by implication, imposed on the FBI a clear, non-discretionary duty to complete background checks. *Id*. The *Kaplan* court acknowledged that "there appears to be no single statute that, standing alone, expressly imposes a mandatory duty on the FBI to perform background checks." *Id*. However, after utilizing an impressive array of sources, the Kaplan court held "[u]nder these limited circumstances, where Congress has conditioned CIS's mandatory action on the FBI's completion of background checks, and

where applicants must pay the FBI, through CIS, to complete the background checks, the Court holds that Congress has, by implication, imposed on the FBI a mandatory duty to complete the background checks." *Id.*

Given that there is no sole statute or regulation that imposes a duty on the FBI to an applicant, and the one court that did find a duty found it through implication, there does not appear to be a *clear* duty *to an applicant* to act, which is required for Mandamus Act jurisdiction. However, "CIS has a mandatory duty to process applications for [legal permanent resident] status and naturalization, but Congress [has] prohibited CIS from processing such applications until it receives completed background checks from the FBI." *Kaplan*, 41 F.Supp.2d at 400 (citing Pub.L. No. 105-119, 111 Stat. 2448 (Nov. 26, 1997)). The FBI, therefore, has a non-discretionary duty *to CIS* to process Name Checks. Extending the FBI's duty to an applicant is something this Court, and most other courts, have not done. Whether any such duty to an applicant would be discretionary or non-discretionary is yet another question this Court will not address now. Therefore, this Court is without jurisdiction, under the Mandamus Act, to review the pace at which the FBI is processing Eldeeb's application.

The Administrative Procedures Act

The Supreme Court has stated that under the APA, "[f]ailures to act are sometimes remediable under the APA, but not always." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). "[T]he only agency action that can be compelled under the APA is action legally *required*." *Id.* (emphasis in original). As in the case of the Mandamus Act, the FBI owes a non-discretionary duty to CIS, but does not owe any duty to an applicant, to process an application. Therefore, this Court is without jurisdiction, under the Administrative Procedures Act, to review the pace at which the FBI is processing Eldeeb's application.

The Declaratory Judgment Act

As in the case of CIS, this Court has previously concluded that it does not have an independent basis for jurisdiction in this case under the Mandamus Act, or under the APA, and because the DJA does not confer jurisdiction itself, this Court is without

jurisdiction under the DJA to review the pace at which the FBI is processing his application.

With respect to the pace at which the FBI processes a Name Check for CIS, this Court is without subject matter jurisdiction under the Mandamus Act, the Administrative Procedures Act, and the Declaratory Judgment Act.  Therefore, with respect to Robert Mueller, Director, Federal Bureau of Investigation, Defendants' Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is **GRANTED**.

This Court would like to echo the sentiment expressed by the *Shalabi* court, and others, under similar circumstances.  This Court understands Eldeeb's desire to become an American citizen, and sympathizes with the delay that he must endure while his application is being processed.  However, this Court is not in a position to give him the relief he has requested.  "Unfortunately, delays of this nature are inevitable and becoming more frequent in light of heightened security concerns in the post-911 world." *Alkenani v. Barrows*, 356 F.Supp.2d 652, 657 (N.D.Tex.2005).

Fortunately, it is to alleviate the hardships faced in just these situations that an applicant that is waiting for an adjustment of status may apply for and obtain employment authorization for the entire time his or her application is pending.  (Docket. No. 16, Exhibit 1, p5).  Most applicants may also apply for and obtain advance parole to enable them to travel abroad during the pendency of their application.  *Id*.  Until a duty *to an applicant*, regarding processing background investigations, is imposed on the FBI, this Court is powerless to consider the legal questions regarding the pace at which the FBI must process such background checks.  Despite the frustrating nature of the situation, Eldeeb will have to wait until the FBI completes its background investigation.

## MOTION TO DISMISS UNDER  RULE 12(b)(6)

Based on the order set forth above, the Court finds that this motion should be denied as **MOOT**.

**CONCLUSION**

This Court finds that the 8 U.S.C. § 1252(a)(2)(B)(ii) jurisdictional bar to discretionary decisions of the Director of Homeland Security, those under his direction, the Attorney General, and those under his direction, is to be construed broadly, so as to include decisions and actions in immigration matters other than those regarding removal orders. This protection extends to CIS, as an agent of the Director of Homeland Security, and the FBI, as an agent of the Attorney General.

This Court finds that CIS owes a non-discretionary duty to applicants to process and adjudicate an I-485 application for adjustment of status. The non-discretionary duty to an applicant to process the application is also invoked if CIS' actions are tantamount to a refusal to process an application. This Court finds that CIS does not owe a non-discretionary duty to an applicant to process an I-485 application at a certain pace. Consequently, this Court finds that the jurisdictional bar is in effect regarding this Court's subject matter jurisdiction regarding the pace at which CIS processes an I-485 application.

The Mandamus Act and the Administrative Procedures Act themselves limit this Court's jurisdiction to non-discretionary matters. The 8 U.S.C. § 1252(a)(2)(B)(ii) jurisdictional bar limits this Court's jurisdiction regarding CIS' decisions or actions, regarding immigration matters, to non-discretionary matters as well. Accordingly, with respect to these two Acts, the jurisdictional bar is superfluous regarding CIS' decisions or actions on immigration matters.

The pace of processing an application is an act within CIS' discretion, which is in accord with the deference usually granted to the Executive Branch in immigration matters. Therefore, both the 8 U.S.C. § 1252(a)(2)(B)(ii) jurisdictional bar, and the Acts themselves, preclude judicial review of the pace at which CIS' processes an I-485 application. Without an independent basis for jurisdiction over CIS under the Mandamus Act, or under the Administrative Procedures Act, and since the Declaratory Judgment Act does not confer jurisdiction, this Court is without subject matter jurisdiction to review the pace at which CIS processes Eldeeb's I-485 application.

This Court finds that the FBI owes a non-discretionary duty to CIS to process a background investigations for immigration matters.  This Court finds that the FBI owes no duty to an applicant to process his or her background check.  Absent a duty to the applicant, neither the Mandamus Act nor the Administrative Procedures Act confer jurisdiction on this Court over the FBI.  Without an independent basis for jurisdiction over the FBI, and since the Declaratory Judgment Act does not confer jurisdiction, this Court is without subject matter jurisdiction to review any decisions or actions of the FBI regarding its processing of a background check for CIS that is related to immigration matters.

Eldeeb's only viable complaint at this time concerns the pace at which his application is being processed.  This Court is without subject matter jurisdiction to review the pace at which Eldeeb's application is processed by CIS, and is without subject matter jurisdiction to review any decisions or actions of the FBI's processing of Eldeeb's background investigation.  Therefore, Defendant's Rule 12(b)(1) Motion to Dismiss for lack of subject matter jurisdiction using a factual challenge is **GRANTED**.

This court need not address Defendant's Rule 12(b)(1) facial attack on subject matter jurisdiction.  Therefore, it is denied as **MOOT**.  Likewise, this Court need not address the Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim.  Therefore, it is also denied as **MOOT**.  Accordingly, it is

**ORDERED** Defendant's Motion to Dismiss (Docket No. 10) is hereby **GRANTED** for the reasons set out herein and the Clerk of Court is directed to dismiss this case for lack of subject matter jurisdiction and to close the case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 30th day of July, 2007.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

cc: All Parties and Counsel of Record